Scott J. Street (SBN 258962)
JW HOWARD/ATTORNEYS, LTD.
201 South Lake Avenue, Suite 303
Pasadena, CA 91101
Tel.: (213) 205-2800
Email: sstreet@jwhowardattorneys.com

John W. Howard (SBN 80200)
JW HOWARD/ATTORNEYS, LTD.
600 West Broadway, Suite 1400
San Diego, CA 92101
Tel.: (619) 234-2842
Email: johnh@jwhowardattorneys.com

Attorneys for Plaintiff
PETER MCNEFF

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PETER MCNEFF, | Case No. 23-cv-00106-AMO |
| Plaintiff, | Assigned to Hon. Araceli Martinez-Olguin |
| vs. | |
| THE CITY OF PLEASANTON, et al., | **SECOND AMENDED COMPLAINT** |
| Defendants. | **JURY TRIAL DEMANDED** |
| | Action Filed:    January 10, 2023 |

///

///

///

///

Plaintiff Peter McNeff alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1.      McNeff resides in Contra Costa County. He works for the City of Pleasanton as a police officer assigned to the Pleasanton Police Department ("PPD").

2.      Defendant City of Pleasanton ("City") is a general law city formed under the laws of the State of California and located in Alameda County.

4.      Defendant David Swing is, and at all relevant times was, an employee of the City and Chief of the PPD.

5.      Defendant Larry Cox is, and at all relevant times was, an employee of the City and a Captain of the PPD.

6.      Defendants Swing and Cox are referred to herein as the "Individual Defendants."

7.      The Individual Defendants are sued in their individual capacities. When engaging in the actions alleged below, the Individual Defendants acted under color of law, pursuant to powers delegated to them by the City and with the approval/ratification of the City Manager.

8.      The Court has jurisdiction over the federal claims alleged herein under 42 U.S.C. § 1983 and 28 U.S.C. § 1331, the federal question statute. Venue is proper under 28 U.S.C. § 1391(b)(1).

## FACTUAL ALLEGATIONS

9.      Mr. McNeff is a police officer. He is a City employee and works for the PPD. He has worked for the PPD since December 2015. He still works for the PPD—despite the City's efforts to fire him for engaging in politically protected activity while off duty.

10.      That activity was a political rally in Sacramento that McNeff attended on January 6, 2021. McNeff attended the rally as a private citizen, during his personal time. He did not identify himself as a police officer or a City employee. He wore

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

civilian clothing. He posted pictures of himself and his wife, who also attended the rally, to his personal Facebook page (a page that uses the pseudonym "Jonathan Pete").

11.    McNeff did not engage in any illegal activity at the Sacramento rally. Along with many others, he engaged in peaceful (and lawful) political activity that day.

12.    Following the Sacramento rally, McNeff, a conservative, became a target of the PPD leadership. One officer, a sergeant named Shuffield, wrote a memo to Chief Swing that accused McNeff of being a member of the "Proud Boys" political group that was accused of organizing the riot that took place in Washington, DC, on January 6.

13.    Sergeant Shuffield sent this memo to Chief Swing without speaking to McNeff and without doing any investigation to verify the accusations he was making. Indeed, the accusations were totally unfounded and were made by the sergeant to retaliate against McNeff for taking a political position that Shuffield did not agree with, to destroy McNeff's reputation and character, and, ultimately, to destroy his career.

14.    Chief Swing knew, or reasonably should have known, that the accusations against McNeff were unfounded. Chief Swing also knew that, when he attended the Sacramento rally, McNeff was not on duty. He was not wearing anything that might have identified him as a Pleasanton police officer. He was engaging in protected political activity, as all Americans (including public employees) have a right to do.

15.    Thus, one day later, on January 7, 2021, McNeff was told that the PPD would *not* take any action based on Sergeant Shuffield's memo.

16.    An officer named "Batt," who supported Sergent Shuffield's memo and who wanted to see McNeff punished for his conservative political views, was furious.

SECOND AMENDED COMPLAINT                                  CASE NO. 23-CV-00106-AMO

Thus, on January 10, 2021, he sent an email to the City complaining about McNeff's attendance at the Sacramento rally. He falsely signed the email as an "anonymous concerned citizen."

17.     Chief Swing knew, or reasonably should have known, that the allegedly "anonymous" email complaint came from a disgruntled officer within the PPD, not a citizen. Nonetheless, in a total abdication of his duties, and to punish McNeff for his conservative political views and protected political activity, Chief Swing immediately relieved McNeff of his duties and placed him on leave. The PPD did not tell McNeff about the nature of the investigation for two months. It spent that time pouring over his social media accounts to find something to use to fire him.

18.     In March, the PPD launched a formal investigation of Mr. McNeff's political beliefs. The investigation was instituted by Chief Swing as part of the PPD's "Patriot Purge," a concerted effort by the liberal PPD leadership (including Chief Swing) to rid the police department of officers who hold conservative political views.

19.     The investigation was retaliatory on its face. It was sparked entirely by McNeff's participation in protected political activity, by McNeff holding conservative political beliefs that the PPD leadership (including Chief Swing) disagreed with. And it was launched in bad faith, despite Chief Swing's acknowledgment that McNeff had engaged in protected (and lawful) First Amendment activity on January 6.

20.     Chief Swing knew that the investigation was improper. So did Captain Cox, the officer that Chief Swing delegated the investigation to (and another of the liberal PPD leaders who was carrying out the Patriot Purge). Both Swing and Cox knew they could not punish McNeff for participating in a political rally while off duty, even if they disagreed with his views. That principle is clearly established by numerous judicial decisions. Therefore, Chief Swing and Captain Cox designed the investigation to go back through years of McNeff's social media posts, including posts that predated his employment with the City. Their reasoning was simple: although

JW HOWARD/ ATTORNEYS, LTD.
600 West Broadway, Suite 1400
San Diego, California 92101

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

they could not discipline or fire McNeff for attending the January 6 Sacramento rally, they might be able to find some off-color social media posts to use against him.

21.     To disguise their animus, Chief Swing and Captain Cox hired a law firm to handle the investigation. The law firm interviewed numerous police officers. Many of them accused McNeff of being a racist because of his conservative political views. These comments reflected the political atmosphere that Chief Swing has created at the PPD, an atmosphere that is outwardly hostile to conservatives like McNeff.

22.     The law firm largely exonerated McNeff. It concluded that he did not violate any City or PPD policies by attending the January 6 Sacramento rally. It also rejected the PPD's argument that McNeff had made racist comments on social media that prevented him from faithfully serving the community. In fact, of the five accusations the PPD made against McNeff, the law firm sustained only two of them. One involved vague comments McNeff made on social media about Bill Cosby during 2014, before he worked for the City, which included a comment about Islam. The other concerned a post about COVID-19 mandates that McNeff made in late 2020, but which had nothing to do with the City.

23.     Given that the law firm largely exonerated McNeff, including against the charge that supposedly sparked the investigation (the January 6 rally), McNeff expected to return to work. Instead, the City tried to fire him. That decision was made by Chief Swing acting pursuant to authority delegated to him by the City Manager. The City Manager also knew about and ratified the decision, lending the City's entire support to the PPD's effort to fire McNeff for his political beliefs.

24.     Not content to simply fire McNeff, the City and its PPD leaders (including Swing and Cox) also disparaged McNeff during the termination process. They prevented him from obtaining employment at another agency and accused him of being a racist.

25.     McNeff challenged his termination through arbitration. He won. The

SECOND AMENDED COMPLAINT                                    CASE NO. 23-CV-00106-AMO

arbitrator ordered that McNeff be reinstated and paid his full back pay, plus 10 percent interest. A true and correct copy of the arbitrator's order is attached as **Exhibit "A."**

26.     The arbitrator sharply criticized the City in his decision. For example, the City conceded in the arbitration that the social media posts it tried to fire McNeff over "were made as a private citizen regarding matter[s] of public concern and were, accordingly, protected by the First [A]mendment." It argued that it could do so, under the Supreme Court's *Pickering* decision, because McNeff's comments were "'disruptive to the Department, [ ] disruptive to working relationshjps, [ ] disrupts the routine operation of the office, [and] can interfere with a speaker's performance as an officer.'" But, as the arbitrator found, the "City presented no evidence that McNeff's Facebook posts were disruptive to the Department or that they interfered with his performance as a police officer." The arbitrator also noted that, with one exception, the social media posts had been on McNeff's Facebook page since 2014 but had not been discovered by the City even when it did a background investigation on McNeff before hiring him. As the arbitrator explained: "Since no one from the Department was aware of the 2014 posts, they could not possibly have caused any disruption." And the one post that McNeff made while working for the PPD, a December 28, 2020, post about Covid-19, "was made after McNeff made his Facebook page private."

27.     The arbitrator also blasted Chief Swing and Captain Cox, the people who led the investigation of McNeff, finding that "not only did Captain Cox and Chief Swing testify that they had no evidence anyone from the public was aware of these posts," that the City tried to fire him over, "but Captain Cox testified that no one who was interviewed during the investigation said they had ever seen McNeff act inappropriately toward Muslims or other minorities." Indeed, the arbitrator noted that the PPD "had never received a single complaint of discrimination by McNeff."

28.     Chief Swing and Captain Cox knew they had no basis to fire McNeff. They knew he engaged in politically protected activity, either off duty or before he

SECOND AMENDED COMPLAINT                                    CASE NO. 23-CV-00106-AMO

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

joined the PPD, and that he had been an exemplary officer whose conservative political views had no impact on his job performance. But they tried to fire him anyway because he is a conservative and because they did not like the fact that he attended a political rally on January 6.

29.     Those actions were unlawful. Even as a public employee, McNeff has a First Amendment right to engage in political activity on matters of public concern. That is all he did. His supervisors, Chief Swing and Captain Cox, knew that. They had an obligation to respect McNeff's political views and protect him from retaliatory actions in the workplace. They did the opposite. They retaliated against him because they did not agree with his political views and activity and because they wanted to make an example of him, as part of the Patriot Purge they were carrying out through the department.

30.     McNeff previously filed some charges of discrimination with the California Department of Fair Employment and Housing. He filed a new charge with the DFEH this week. It asks the State to investigate ongoing acts of discrimination and retaliation and the associated hostile work environment that McNeff has encountered since he successfully opposed the City's politically motivated effort to fire him. That charge was timely: in 2019, the California Legislature changed the law to allow administrative charges to be brought within "three years from the date that the alleged unlawful practice occurred or refusal to cooperate occurred." Cal. Gov't Code § 12960(e)(3); *see also Conway v. City of Palm Desert*, No. 5:21-cv-01144-SPG-SP, 2023 WL 5677858, at *4 (C.D. Cal. July 25, 2023) (explaining that "former one-year statute of limitations applies to any FEHA claim that accrued more than one year before January 1, 2020, while the current three-year period applies to any FEHA claim that accrued less than one year prior to, or after, January 1, 2020"). If the State declines to investigate the new charge, McNeff may bring a new complaint based on the new administrative charge.

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

# FIRST CLAIM FOR RELIEF

## (42 U.S.C. § 1983/First Amendment Retaliation vs. the Individual Defendants)

31.　Mr. McNeff incorporates paragraphs 1 through 30 of this complaint as thought set forth fully herein.

32.　When he attended the January 6 Sacramento rally, McNeff was engaged in activity that is protected by the First Amendment, including his right to political expression and political association. He exercised those rights with respect to a matter of public concern—the 2020 election, specifically, and electoral integrity, generally—and did so on his own time, as a private citizen and without any connection to his job at the PPD.

33.　The Individual Defendants retaliated against McNeff's protected political by falsely accusing him of being a racist and a member of extremist political groups. They also retaliated against McNeff by launching an investigation into his political beliefs and past social media commentary (also all First Amendment protected activity) after learning that he had attended the Sacramento rally and by trying to fire him even after the law firm that they hired to investigate McNeff largely exonerated him of misconduct. The retaliatory investigation and termination efforts constituted adverse employment actions: that is, they were actions that would deter a person of ordinary firmness from engaging in constitutionally protected activity and represented material changes to the terms of McNeff's employment.

34.　The Individual Defendants also violated McNeff's First Amendment rights by trying to fire him for comments he made on social media about matters of public concern before he even worked for the PPD. Those actions would deter a person of ordinary firmness from engaging in such activity. Indeed, under such circumstances, an ordinary person would never comment on matters of public concern, even as a private citizen, because of the risk that he or she could be punished (even fired) for expressing certain political views.

35.     When engaging in the actions alleged above, the Individual Defendants acted with the intent of chilling McNeff's exercise of his First Amendment rights. McNeff's protected political activity was a substantial factor in causing the Individual Defendants to take those adverse employment actions. Indeed, as the arbitrator noted, McNeff had a stellar record. The Individual Defendants did not take any action against him until after McNeff attended the January 6 rally in Sacramento and they learned that he was a conservative. And while the Individual Defendants may argue that they had a legitimate reason to take those actions against McNeff, McNeff disputes that argument and the arbitrator specifically found otherwise. Those findings are binding on the Individual Defendants in this case.

36.     A person of ordinary firmness would be chilled from continuing to exercise his constitutional rights under these circumstances.

37.     As a result of the Individual Defendants' actions, McNeff suffered damages in an amount to be proven at trial. That harm includes the emotional distress McNeff suffered during the termination process as well as the reputational harm he suffered from being falsely accused of racism, political extremism, and job-related misconduct. McNeff also suffered financial damages because of the Individual Defendants' actions, including lost wages and reduced future earning potential. Some of that financial harm has been remedied by the arbitrator's reinstatement of McNeff's employment and award of back pay, plus interest, but the arbitration award did not cure all the financial harm that McNeff suffered, leaving some economic damages for him to recover in this case. For example, despite being reinstated to his job, McNeff lost work opportunities during the time he had to spend fighting to save his job. And the reputational harm he suffered from the retaliatory investigation and termination proceeding continues to affect him.

38.     The Individual Defendants acted despite knowing that their actions were unconstitutional, as it is clearly established that a public employee cannot be fired—

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

nor even investigated, the first step taken here—for engaging in lawful political activity. *See, e.g., Robinson v. York*, 566 F.3d 817, 825-26 (9th Cir. 2009) (noting that, as of "2005 and 2006, both the constitutional protection of employee speech and a First Amendment cause of action for retaliation against protected speech were clearly established and potentially applicable to Defendants' conduct" and thus barred qualified immunity defense). Thus, they are not entitled to qualified immunity. To the contrary, by acting with knowledge of their misconduct, and with the intent to cause harm to McNeff, the Individual Defendants acted with malice and should be held liable for punitive damages.

39.    The Individual Defendants' actions were a proximate and actual cause of the damages.

40.    McNeff should recover his attorneys' fees under 42 U.S.C. § 1988.

## SECOND CLAIM FOR RELIEF

**(42 U.S.C. § 1983/First Amendment Retaliation vs. the City under *Monell*)**

41.    Mr. McNeff incorporates paragraphs 1 through 30 of this complaint as though set forth fully herein.

42.    The adverse employment actions taken against McNeff, as alleged above, were taken by Chief Swing pursuant to authority delegated to him by the City Manager regarding police personnel matters. Pursuant to that delegation of authority, Chief Swing had the discretion in making personnel related decisions regarding McNeff's employment. Thus, Chief Swing's decision to carry out the retaliatory investigation and termination proceeding against McNeff constituted the decisions of a final policymaker that can be attributed to the City under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978).

43.    The City Manager is also a final policymaker for the City with respect to employment matters. The City Manager knew about the unlawful actions taken against McNeff by Chief Swing and Captain Cox—namely the retaliatory

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA 92101

investigation and termination proceeding—and ratified the decision. That ratification included putting the entire weight of the City government behind the retaliatory investigation and termination proceeding, even after it became clear that the investigation and termination proceeding were being pursued in bad faith, to punish McNeff for holding conservative beliefs and to force him and other conservatives out of the PPD.

44.    As a result of this unconstitutional policy/practice, McNeff suffered damages to be proven at trial. The City's policy was the proximate and legal cause of McNeff's damages.

45.    McNeff should recover his attorneys' fees under 42 U.S.C. § 1988.

## **PRAYER FOR RELIEF**

Wherefore, Mr. McNeff prays for relief as follows:

1.    For compensatory damages—including damages for emotional distress and reputational harm—in an amount to be proven at trial.

2.    For interest as authorized by law.

3.    For costs and attorneys' fees under 42 U.S.C. § 1988.

5.    For all other relief that the Court determines is just and proper.


DATED:  January 9, 2024            JW HOWARD/ATTORNEYS, LTD.




By:    _____/s/ Scott J. Street_____

Scott J. Street
Attorneys for Plaintiff
PETER MCNEFF

JW HOWARD/ ATTORNEYS, LTD.
600 WEST BROADWAY, SUITE 1400
SAN DIEGO, CALIFORNIA  92101

SECOND AMENDED COMPLAINT                              CASE NO. 23-CV-00106-AMO

## <u>JURY TRIAL DEMAND</u>

Mr. McNeff demands a trial by jury.

DATED:  January 9, 2024          JW HOWARD/ATTORNEYS, LTD.

By:  _____/s/ Scott J. Street_____
     Scott J. Street
     Attorneys for Plaintiff
     PETER MCNEFF

SECOND AMENDED COMPLAINT                    CASE NO. 23-CV-00106-AMO

**EXHIBIT A**

IN THE MATTER OF THE ARBITRATION
BEFORE ARBITRATOR EDWARD SCHOLTZ


PETER MCNEFF

      Grievant,                                      **OPINION & AWARD**

v.                                                **CSMCS Case NO. ARB-21-0318**

CITY OF PLEASANTON

      Employer.

---

**Appearances:**

**For the Grievant**
**Jason Buffington and Gidian Mellk,**
**Rains Lucia Stern St. Phalle & Silver, PC**


**For the City of Pleasanton**
**Geoffrey Spellberg**
**Renne Public Law Group**

## INTRODUCTION

Peter McNeff was a Pleasanton Police Officer. McNeff was terminated for three social media posts he made on his Facebook page in 2014 prior to becoming a Police Officer and for a post he made on his Facebook page in 2020 while he was employed as a Pleasanton Police Officer. A grievance was filed and all steps prior to arbitration were exhausted and the matter was submitted to arbitration. The undersigned was selected as the Arbitrator from a panel of arbitrators supplied to the parties by The California Mediation and Conciliation Service. An arbitration hearing was held in Pleasanton California on January 11 & 12, 2023. The matter was submitted to the arbitrator by closing briefs sent to the arbitrator.

## THE ISSUE

Was the Grievant, Peter McNeff, properly terminated from his employment by the City of Pleasanton and, if not, what is the appropriate remedy?

## STATEMENT OF FACTS

The Grievant, Peter McNeff was hired by the City of Pleasanton Police Department on December 7, 2015. On January 6, 2021, he and his wife attended a "Stop the Steal" rally in Sacramento California to protest the transfer of power to the Biden Administration following the 2020 presidential election. He posted images of his attendance at the rally on his Facebook page where the images were seen by other Pleasanton police officers. Pleasanton Police Officer Keith Batt, who had been McNeff's Training Officer, heard about McNeff posting Facebook photos from what Batt misunderstood was the Washington D.C. "Stop the Steal" rally. Batt, who disagrees with Officer McNeff's political views, found McNeff's Facebook account by going through the account of another officer who had a public account. Batt, however was unable to

2

find the photo of McNeff and his wife at the rally. Batt then did a deep dive through McNeff's

Facebook posts going back more than 900 posts to find posts made by McNeff in 2014, prior to

his becoming a Police Officer. Batt took screenshots of the McNeff Facebook posts he found

objectionable and sent the screenshots via an anonymous "citizen's complaint," to the chief of

Police, the City Manager, and the City. The Batt anonymous letter included the three 2014 posts

McNeff had made before he became a Police Officer; the "isn't this why cars have bumpers"

post, the "Bill Cosby" post, the Palestinian post and several posts allegedly showing that McNeff

was a Pleasanton Police Officer.

Concurrent with Officer Batt's actions, Pleasanton Police Officer Tim Martens reported

the "crazy fucking shit" Facebook post McNeff posted to his private Facebook Account on

December 28, 2020. In response to internet comments by an individual upset with the COVID-

19 health orders, McNeff posted:

> "Red blooded Americans are bullied and pushed into a corner. We don't
> want to fight but better believe when the time comes, it will be swift, it will
> be violent, and not a single regret will be felt."

Officer Martens advised one of his supervisors, Lt. Sarasua, who in turn advised her

commanding officer about the post.

Chief Swing received the Batt anonymous email which contained the Grievant's 2014

Facebook posts. Chief Swing was concerned regarding the Bill Cosby post. Chief Swing testified

about the extensive local Muslim community which includes the Muslim Community Center

located in Pleasanton that hosts Muslims from throughout the Bay Area. He also testified that

the Alameda County fairgrounds (located in Pleasanton) hosts large events that attract Muslim

3

visitors. Chief Swing concluded that McNeff's endorsement of the anti-Muslim assertions in the Bill Cosby post created substantial concerns about McNeff's racial bias and his credibility.

Chief Swing and the City Manager conferred with the Human Resources Director, and all agreed to put McNeff on administrative leave and have the matter investigated by an impartial outside professional investigator. The law firm, Burke Williams and Sorenson ("Burke Williams") was selected for the assignment. The Chief learned about McNeff 's "threat of violence" post during that investigation.

Burke Williams completed the investigation and prepared a 61-page report. The Burke Williams report sustained two findings of misconduct.

1. The investigators sustained Allegation 1.3 that "McNeff posted anti-Muslim comments on social media in violation of the City and/or PPD policies on discrimination and harassment, code of ethics, and prohibited speech."
2. The investigators sustained Allegation 1.5 that "McNeff posted comments on social media that threatened violence in violation of the City and/or PPD policies on discrimination and harassment, code of ethics, prohibited speech."

The sustained findings by Burke Williams formed the basis for the termination decision.

Chief Swing directed Captain Lawrence Cox to review and analyze the findings in the Burke Williams report and to provide a recommendation. Captain Cox recommended that McNeff's employment be terminated:

> "McNeff's decision to report articles and make insensitive and offensive comments, as well as comments suggesting he was condoning violence, is absolutely unacceptable in our department. His posts clearly place the Department in an unfavorable light, and they tend to bring discredit upon the Department and are inconsistent with our mission to serve the community."

Chief Swing agreed with the termination recommendation and McNeff was terminated from his employment as a Pleasanton Police Officer. A Skelly hearing was held and at the conclusion of the hearing, Chief Swing upheld the termination. McNeff appealed that decision to the City Manager. Following a hearing, the Interim City Manager affirmed the earlier decision and the termination process was completed.

The Grievant, Peter McNeff, was hired by the City of Pleasanton Police Department on December 7, 2015. At that time, his Facebook profile was public. According to witness Jessie Stricchiola, Founder and CEO of Alchemist Media, that meant that anyone, regardless of friend status with the poster, could have viewed McNeff's posts. McNeff's Facebook page showed him as being a member of the "Community Services Department" in Pleasanton. McNeff did not identify himself as a member of the Department but as a member of the Community Services Department in Pleasanton specifically to differentiate himself from the Department. McNeff additionally took the following measures when he made his Facebook profile private:

> I did my best to select all the security settings that would limit any search-ability of my information. I changed my name to a derivation of my name, using my middle name and first name, an unofficial, common practice among officers that do that. Made sure, that obviously I hadn't put any photos of myself in uniform, no work-related photos, as far as activity when we were working. No photos of any of my friends or coworkers in uniform, things of that nature.

The three 2014 posts were on McNeff's public Facebook account when the investigator reviewed it. McNeff made his Facebook account private in 2019, at which time he changed his

profile name to "Jonathan Pete" for precautionary and privacy purposes. He also made sure there were no photos of himself in uniform, no work-related photos, and no photos of any of his friends or co-workers in uniform. His Facebook account included the December 28. 2020 post regarding COVID mandates, a picture of a Pleasanton Police badge with a mourning band across it, a picture of the American flag with a thin blue line and the quote, "Blessed are the peacemakers, for they shall be called children of God."

Prior to his hire, McNeff voluntarily provided the City's background investigator with his Facebook account name ("Peter McNeff") for the purpose of thoroughness. The investigator wrote:

> McNeff told me he does have a Facebook account. I viewed the public side of his account and did not find any of his postings objectionable. I did an internet search using McNeff's name and his email addresses and did not find him associated with any websites that would be considered objectionable for someone working in law enforcement.

The City concluded that McNeff made Facebook postings "offensive to Palestinians and Muslims" and that "endors(ed) violence" and accordingly terminated him for violating the following policies:

1. **Pleasanton Police Department section 342.5.9(m):** "Any other on or off-duty conduct which any member knows or reasonably should know is unbecoming a member or this department, is contrary to good order, efficiency or morale, or tends to reflect un favorably upon this department or its members."

2. **Pleasanton Police Department section 1058.4(b):** "Speech or expression that, while not made pursuant to an official duty, is significantly linked to, or related to, the

Pleasanton Police department and tends to compromise or damage the mission, function, reputation or professionalism of the Pleasanton Police Department or its employees. Examples include: 1) Statements that indicate disregard for the law or of the state or U.S. Constitution. 2) Expression that demonstrates support for criminal activity."

3. **Pleasanton Police Department section 1058.4(c):** "Speech or expression that could reasonably be foreseen as having a negative impact on the credibility of the employee or a witness. For Example, posting statements or expressions to a website that glorify or endorse dishonesty, unlawful discrimination or illegal behavior."

4. **Pleasanton Police Department section 1058.4**(c): "Speech or expression that is contrary to the canons of the Law Enforcement Code of Ethics as adopted by the Pleasanton Police Department.

5. **City of Pleasanton/Police Officer's Association MOU section 22.2(11):** "Willful violation of any of the provisions of the City Ordinances, Resolutions, or department policy related to the conduct of city officers and employees."

6. **Code of Ethics:** "I will keep my private life unsullied as an example to all and will behave in a manner that does not bring discredit to me or to my agency."

7. **City of Pleasanton Policy: Harassment, Discrimination, and Retaliation":** Defining harassment to include "Speech, such as epithets, derogatory comments or slurs, and propositioning on the basis of a protected classification."

8. **Pleasanton Police Department section 330 (Discriminatory Harassment):** Defining discriminatory harassment to include; "derogatory comments" and "stereotyping."

7

## DISCUSSION

## The Issue of Violence

In 2014, before he became a police officer, McNeff posted a news article from ABC 7 News regarding protests in the City of Berkeley. The news article contained a photograph of two police officers with fire extinguishers, in riot gear, along with a third officer depicted in riot gear. In that photo, which is part of the news article, on the ground appears to be some discarded objects that were potentially set ablaze during the protest. There are no protesters depicted in the photo. McNeff wrote, "Isn't this why cars have bumpers? J/k."

Chief Swing wrongly believed that McNeff made this post while he was a police officer and also wrongly believed that McNeff made a conscious decision to leave the post on his Facebook page.

McNeff stated that it "was a very poor, classless attempt at gallows humor, something I'm not proud of." McNeff further testified that he does not think it is funny to hit protesters with cars and was not seriously suggesting that people strike protesters with cars. McNeff testified that it was inappropriate for him to have posted it to his Facebook page.

The City presented no evidence that any individual from the Department other than Officer Batt, or any member of the public had ever seen this post on McNeff's Facebook page. The City also presented no evidence that McNeff ever engaged in violence.

The only McNeff Facebook post that McNeff made while he was a Police Officer that is at issue in this case is the COVID post on December 28, 2020. McNeff's post was made nine months after California and most of the country had locked down due to the novel coronavirus. McNeff posted:" Red blooded Americans are being bullied and pushed into a corner. We don't

8

want to fight but better believe when the time comes, it will be swift, it will be violent, and not

a single regret will be felt." McNeff testified that he had just read an article about mandates and

lockdowns, and had a strong emotional response due to the fact that his uncle, who had a

potentially cancerous brain tumor, was unable to go to the hospital for basic testing. McNeff

testified that he wrote the post while he was "in a pretty emotional, frustrated and sad state."

And was trying to show empathy for others in the same situation. McNeff acknowledged that he

could have expressed his thought in a better way and that he would never advocate for

violence. McNeff regrets having written the post.

Captain Cox testified that he was unaware of anyone other than those involved in the

investigation who saw this post, and acknowledged that no investigation witness expressed any

belief that McNeff would actually engage in violence. Captain Cox did not know that a family

member of McNeff had been denied a cancer screening due to COVID restrictions, and

understood that such a fact could cause someone to become emotional. Both Captain Cox and

Chief Swing testified that there was no news coverage of this post, and no indication that any

member of the public saw the post.

Lt. Sarasua and Officer Martens both believed that the post was emotional and

impulsive and neither thought McNeff would actually engage in violence. The City presented no

evidence that the COVID post actually caused any disruption within the Department. Lt. Sarasua

testified that verbally counselling McNeff regarding the issue of violence would have been

sufficient and Captain Eicher had no objection. Because the City. Provided no evidence of any

disruption to the Department due to the COVID post or even any possibility of disruption and

because the City provided no evidence that the post impeded his performance as a police officer, there was no basis for the City to impose discipline. There is no evidence that McNeff has ever, in his eight years as a police officer, been violent on duty.

**McNeff's Alleged Bias against Muslims**

The City alleges that McNeff is biased against Muslims. This claim is based upon the Cosby post and the Palestinian post.

On May 27, 2014, McNeff reposted a post from an individual impersonating Bill Cosby, and wrote, "What the world could be with more Bill Cosby's." The portion of the post that the Department took issue with states as follows: "I'm tired of being told that Islam is a Religion of Peace,' when every day I can read dozens of stories of Muslim men killing their sisters, wives and daughters for their family 'honor'." The Department found this to be "an overgeneralization of Muslim men," and McNeff's statement to be anti-Muslim in nature and not in line with expectations of a Pleasanton Police Officer.

McNeff testified that he came to understand the post attributed certain things to mainstream Islam there were not accurate; rather, the conduct noted therein aligned with Islamic extremism. It affected him strongly that his Muslim co-worker and friend, Police Officer Quaic Habib, found the post offensive. Habib testified that he never felt McNeff treated him any differently or had any bias against him because he was Muslim, and never saw McNeff treat anyone who was perceived to be Muslim any differently from anyone else.

McNeff testified that he did not remove this post from his timeline because he had forgotten it was there; it was buried under over 900 more recent posts. The City presented no evidence that any individuals from the Department aside from Officer Batt was the Cosby

post on McNeff's Facebook page, that any public citizens saw the post or that the post reflects how McNeff views and/or interacts with Muslims in the community. The post had not ever been discovered by members of the Muslim community (or the community in general) and McNeff's assignments over the last several years included the Muslim Community Center and surrounding areas, where he worked as a Police Officer without complaint.

On July 13, 2014, McNeff re-posted to his Facebook page a video from the Israel Video Network with the tagline "there was NEVER a Palestinian state" with an image of present-day Israel. In his post, McNeff included the words, "Can't deny the truth." McNeff explained during his administrative interview and his testimony that he had a firm religious belief that Israel is a sovereign nation.

Captain Cox who authored the Notice of Intent, testified that it is irrelevant to him what the United States policy is toward Palestine, and did not know if the United States recognizes Palestine as a State. The United States, in fact, does not recognize Palestine as an independent State.

The City presented no evidence that anyone from the Department saw this post on McNeff's Facebook page, that any public citizens saw this post, or that the post reflects how McNeff views and/or interacts with Muslims in the community.

**McNeff Did Not Violate The Charged Policies and/or Any Such Violation is Not A Basis For Termination**

McNeff was charged with violating Pleasanton Police Department section 330 (Discriminatory Harassment). The purpose of the Department's policy "is to prevent department members from being subjected to discriminatory harassment, including sexual harassment and

retaliation." The policy further provides that "the Department will not tolerate discrimination against a member in hiring, promotion, discharge, compensation, fringe benefits and other privileges of employment." Since there is no allegation or evidence that McNeff discriminated against or harassed any member of the Department, the Department's Discriminatory Harassment Policy is inapplicable.

McNeff did not believe that his four posts, three of which were made in 2014 before he was hired by the Department, associated him with the Department. Since there is no evidence that any member of the public saw the posts, they could not have linked the posts to the Department. Captain Cox testified that the Facebook posts showing the Department badge and the thin blue line, which "represents law enforcement" "definitely showed that he worked for the City of Pleasanton and was likely a police officer. The badge, the thin blue line, the scripture statement talking about "blessed are the peacekeepers,' a lot of those things are specific to law enforcement. So I think a reasonable person would read that and make a determination that he was a Pleasanton police officer.

The City provided no unbiased witnesses to testify in support of Captain Cox. Further, McNeff explained that he posted the Pleasanton badge as an expression of support for Officer Kyle Hendrickson, who had succumbed to cancer. McNeff testified that "there were many members of the community that were using this, that there were members of Kyle's family and their community that had also used the same image." Moreover, the "thin blue line" was a symbol of support for police officers; an individual who posts that image is not automatically assumed to be an officer.

McNeff acknowledges he should have removed the offensive posts from his Facebook page, the posts were made years ago before he was hired by the Department. McNeff had forgotten about the posts which were buried under more than 906 more recent posts and he had not made a conscious decision to leave them up.

**The Facebook Posts Do Not affect McNeff's Credibility And his Ability To Testify in Court**

The City contends that the Facebook posts could affect McNeff's credibility and that he would be unable to testify in court. **Brady v. Maryland (1963) 373 U.S. 83** governs a prosecutor's disclosure to a defendant in a criminal case of "exculpatory material evidence, including potential impeaching evidence." **(People v. Superior Court (Johnson) (2015) 61 Cal. 4th 696, 709.)** Under **Brady**, evidence is "material" only if it is reasonably probable a prosecution's outcome would have been different had the evidence been disclosed. **(City of Los Angeles v. Superior Court (2002) 29 Cal 4th 12, 7-8.**

Pursuant to **Pitchess v. Superior Court (1974) 11 Cal 3d 531, "**a criminal defendant may, in some circumstances compel the discovery of evidence in the arresting law enforcement officer's personnel that is relevant to the defendant's ability to defend against a criminal charge." **(Johnson, 61 Cal 4th at p. 710.)** In order to have access to an officer's personnel file through a Pitchess motion, a defendant must comply with the procedures specified in Evidence Code section 1043 and 1045. (Ibid) Under **Pitchess**, a defendant must show that the information sought is relevant to the subject matter involved in the litigation (Evidence Code section 1943(b)(3).)

The witnesses who testified for the City on this issue had no understanding of how evidence is in fact admitted into court for impeachment purposes and provided no sound

support for their assertion that the four Facebook posts by McNeff would in fact be **Brady** material or would be discoverable under **Pitches.**

Captain Cox speculated that the Cosby post would affect McNeff's credibility if he were to testify in a case involving Muslims and that his COVID post would affect his credibility in matters involving the use of force. However, Captain cox admitted that he is not a lawyer and is not qualified as an expert on **Brady** matters.

Chief Swing testified that McNeff's alleged bias toward Muslims could impinge on his credibility when investigating criminal allegations. Chief Swing also testified that McNeff's COVID post would impeach his credibility in a case involving use of force. On cross-examination Chief Swing admitted that he does not know under what circumstances evidence of a use of force is allowed to be presented in court in order to impeach an officer's testimony. He also acknowledged that other officers on-scene, as well as body-worn cameras, which Pleasanton police officers are required to wear, provide corroborating evidence of a witness officer's testimony.

Investigator Joseph Kreins testified to his belief that the existence of the "COVID" and "Berkeley" Facebook posts could interfere with McNeff's ability to perform his duties because "it goes to his credibility. It goes to his reputation. It goes to any impeachable information that the defense would look for in regards to is testimony in any case." Kreins admitted that he has never been certified as an expert regarding a prosecution teams' **Brady** obligations. He is not an attorney and has never drafted nor litigated a **Pitchess** motion. Kreins has never been in a judge's chambers for a **Pitchess** motion related to social media issues. Kreins knows nothing about the charging practices of the Alameda District Attorney, such as under what

circumstances the D.A. would decline to file criminal charges due to impeachment material reflecting bias in a witness officer's personnel file.

Kreins was not familiar with the standard of proof for admitting impeachment evidence in court. Kreins admitted that he was not sure what a defendant was required to show to establish good cause for the discovery of peace officer personnel records.

Kreins testified that the "Berkeley" and "COVID" posts establish that McNeff would more likely than not be violent while on duty. However, that speculative statement is contradicted by McNeff's eight years of service as a Pleasanton Police Officer in which he was never involved in violence while on duty.

The City's attempt to demonstrate that the Facebook posts affected his credibility was based upon speculation. The City failed to prove that McNeff's Facebook posts affected his credibility.

**McNeff's Speech is Protected**

The Supreme Court in **Pickering v. Board of Education (1968) 391 U.S. 563,** "established a framework to balance the free speech rights of government employees with the government's interest in avoiding disruption and maintaining workforce discipline." **(Moser v. Las Vegas Metro Police Department (9th Cir. 1991) 984 F.3d 900, 904.)** Under **Pickering,** a plaintiff first has to establish that "(1) he spoke on a matter of public concern; (2) he spoke as a private citizen rather than a public employee; and (3) the relevant speech was a substantial or motivating factor in the adverse employment action." (Ibid, quoting **Barone v. City of Springfield, Oregon, (9th Cir. 2018) 902 F.3d 1091, 1098.)**

The City concedes that McNeff's Facebook postings were made as a private citizen regarding matter of public concern and were, accordingly, protected by the First amendment. The issue is whether the City was justified in terminating McNeff's employment despite the fact that he had engaged in protected speech.

Relying on **Hernandez v. City of Phoenix (9th Cir. 2022) 43 F.4th 966 and Moser, supra,** the City argues that discipline is permissible when the speech "is disruptive to the Department, is disruptive to working relationships, it disrupts the routine operation of the office, it can interfere with a speaker's performance as an officer."

The City presented no evidence that McNeff's Facebook posts were disruptive to the Department or that they interfered with his performance as a police officer. All of the posts at issue, except for the December 28,220 COVID post had been on McNeff's Facebook page since 2014 and were not discovered until 2020., even after the City conducted a background investigation prior to hiring McNeff. Lt. Sarasua, Officer Martens, and Officer Barcelo – were interviewed during the Department's investigation; none reported seeing McNeff's 2014 posts. The City presented no evidence that any other officers in the Department were aware of these posts, despite at least ten officers being Facebook friends with McNeff, and none reported any anti-Muslim posts, something they would have been expected to do. Since no one from the Department was aware of the 2014 posts, they could not possibly have caused any disruption. The December 28, 2020 post was made after McNeff made his Facebook page private. Officer Martens, who is Facebook friends with McNeff, saw this post on McNeff's Facebook page and shared it with Lt. Sarasua. While Lt. Sarasua believed the post could potentially be disruptive to the Department, the City presented no evidence that it actually caused any disruption within

the department. In any event, Lt. Sarasua believed that verbally counselling McNeff would have been sufficient and Captain Eicher had no objection. There is no evidence of any disharmony between McNeff and the employees who were aware of the post. Moreover, there is no evidence that any of the rank and file ever saw this post and no evidence of any disruption to the workings of the Department. The same is true of the Berkeley protest post. Not a single witness testified that he or she was concerned that McNeff would actually perpetrate violence.

There were no media reports of the Facebook posts and no evidence that any member of the public saw any of McNeff's posts; accordingly, there can be no finding that any member of the public associated McNeff's posts with the Department and thus none of his posts "compromised or damaged the mission, function, reputation or professionalism" of the department or its employees.

The City presented no evidence that McNeff's Facebook posts – either those from 2014 or from December 2020 – implicated his ability to work as a police officer. Indeed, not only did Captain Cox and Chief Swing testify that they had no evidence anyone from the public was aware of these posts, but Captain Cox testified that no one who was interviewed during the investigation said they had ever seen McNeff act inappropriately toward Muslims or other minorities. During his eight years of service with the Department. The department had never received a single complaint of discrimination by McNeff. The City failed to prove that McNeff's Facebook posts did, or could be presumed to have, in any way impeded his performance as a police officer.

**Conclusion**

Officer Batt engaged in an extensive search to discover dirt on Officer Peter McNeff so that he could get him fired because he disagreed with his political views. Batt searched thorough more than 900 emails to discover three emails posted by McNeff in 2014 before he was employed by the Pleasanton Police Department. What distinguishes this case from **Hernandez** and others is that we have McNeff's eight subsequent years of employment as a Police Officer by the Pleasanton Police Department. During those eight years, The Department has never received a single complaint related to McNeff's alleged Muslim bias. The Department has never received a single complaint that McNeff engaged in violence. The Department was unable to produce a single member of the public who saw any of McNeff's posts.

McNeff's performance evaluations from May 2016 through August 2020 show that McNeff consistently met or exceeded expectations, including with regard to "personal relations" and "behavior and initiatives." The definition of "meets expectations" is "Performance consistently meets standards and expectations," while the definition of "exceeds expectations" is "Performance is **consistently and clearly beyond established standards and expectations. Demonstrates exceptional skill and achievement."** (Emphasis supplied.)

During his testimony at the hearing McNeff accepted responsibility for his actions and admitted that his postings were inappropriate and that he will not engage in such conduct again.

**AWARD**

The Grievant, Peter McNeff was improperly terminated from his position as a Police Officer with the Pleasanton Police Department. The remedy is that he must be immediately reinstated to his position as a Police Officer with the Pleasanton Police Department with full back pay and benefits including interest at 10% per annum. All files related to this termination must be removed from his personnel file. The Arbitrator retains jurisdiction regarding the implementation of this Award for six (6) months from the date of this Award.

Dated: August 9, 2023

Respectfully submitted,

EDWARD SCHOLTZ, ARBITRATOR

19

**PROOF OF SERVICE**

I, the undersigned am a resident of the state of California, over the age of eighteen years, and not a party in the within action. My business address is 4234 West 159th Street, Lawndale CA 90260.

On the date below, I served my Opinion & Award in Peter McNeff v. City of Pleasanton by placing a True copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the United States mail at Lawndale, California addressed as follow:

Geoffrey Spellberg                          Justin Buffington
350 Sansome St., Suite 300                  2300 Contra Costa Blvd., Suite 500
San Francisco CA 94104                      Pleasant Hill CA 94523

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 9, 2023 at Lawndale, California

Edward Scholtz, Arbitrator

## **CERTIFICATE OF SERVICE**

At the time of service, I was over 18 years of age and not a party to this action. I am employed by JW Howard/Attorneys, LTD. in the County of San Diego, State of California. My business address is 600 West Broadway, Suite 1400, San Diego, California 92101.

On January 9, 2024, I electronically filed the **SECOND AMENDED COMPLAINT** and served the documents using the Court's Electronic CM/ECF Service which will send electronic notification of such filing to all registered counsel.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed on January 9, 2024 at San Diego, California.

*/s/ Dayna Dang*
Dayna Dang, Paralegal
dayna@jwhowardattorneys.com